[Cite as *In re J.H.*, 2016-Ohio-677.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re J.H., S.H., L.H.

Court of Appeals No. L-15-1230
L-15-1232

Trial Court No. JC 14238269

**DECISION AND JUDGMENT**

Decided: February 23, 2016

* * * * *

Laurel A. Kendall, for appellant.

Shelby J. Cully, for appellee.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Appellant, father, appeals the August 7, 2015 judgment of the Lucas County Court of Common Pleas, Juvenile Division, which terminated his parental rights with respect to J.H., S.H., and L.H., and awarded permanent custody to Lucas County Children's Services ("LCCS"). The mother has not appealed the trial court's judgment. For the reasons set forth herein, we affirm.

{¶ 2} On February 10, 2014, a complaint in dependency and neglect was filed and alleged that the children, twins girls, eight, and sister, six, were left with relatives on December 24, 2013, and the parents' whereabouts were unknown. The complaint further alleged that the parents were abusing drugs, had mental health issues, the children's hygiene was poor and their health issues were untreated, and there were sexual abuse and domestic violence concerns. On the same date, LCCS was awarded temporary custody and the children remained at the home of their paternal uncle. On April 1, 2014, the children were adjudicated neglected and temporary custody was awarded to the parental uncle.

{¶ 3} The initial case plan was filed on March 11, 2014, with a goal of reunification. Mother's referral centered on her drug abuse and mental health issues. Father was referred for a mental health and drug and alcohol assessments and ordered to obtain suitable housing. He was initially ordered to attend a domestic violence batterer's program but it was determined that he was not the aggressor in the relationship.

{¶ 4} Father did not complete his assessment until June 23, 2014. He was not given a mental health diagnosis and not recommended for any substance abuse treatment. It was noted that he would benefit from support services from Al-Anon and NAMI.

{¶ 5} In October 2014, father and mother were charged with rape and gross sexual imposition of the children. Father remained jailed until June 2015, when the charges were dismissed. Mother remained incarcerated for the duration of the proceedings.

2.

{¶ 6} On January 14, 2015, LCCS filed its motion for permanent custody. The motion noted the children's sexual abuse diagnoses, the parents' incarceration and lack of housing, and the children's need for a legally secure placement.

{¶ 7} A hearing on the permanent custody motion commenced on July 15, 2015. A Zepf Center therapist testified that she had been treating L.H. for approximately eight months and had diagnosed her with PTSD and anxiety. The therapist believed that the diagnoses stemmed from the trauma of sexual abuse which L.H. stated was perpetrated by her parents. She stated that L.H. was consistently attending sessions and her caregivers were implementing her recommendations. Due to this, L.H. had been making good progress and was engaging properly with peers and her anger had subsided.

{¶ 8} A second Zepf Center therapist testified that she began treating J.H. in February 2015; she took over from a prior therapist. J.H. had been diagnosed with PTSD, Depression, and Encopresis (involuntary bowel movements.) She stated that J.H. met these diagnoses in part due to being a victim of sexual violence and a witness to family sexual violence. J.H. stated that her parents were the perpetrators as well as an uncle and half-sibling.

{¶ 9} Paternal aunt, A.H., testified that she first met the children in the summer of 2013, and at that time they were filthy with a rash that looked like scabies. She testified that on Christmas Eve 2013, when they arrived at the family's home which was in very poor condition, the parents were screaming at each other. A.H. stated that mother said

3.

they could keep the children for an undetermined amount of time. The children then began living with A.H. and her family which included three children.

{¶ 10} A.H. testified that in January 2014, mother kicked out father and he came to live with them. A.H. stated that she and her husband asked father to leave after a short time because he kept leaving to be with mother, having mother at the house while she appeared to be under the influence of drugs, and the couple was fighting constantly. A.H. indicated that they informed father that if he left with mother he would not be permitted to return. Father decided to leave.

{¶ 11} A.H. testified that in February 2014, they contacted LCCS because they were unable to reach the parents and the children had medical needs and school issues. A.H.'s husband, J.H.'s brother and her fiancé at the time, was able to obtain temporary custody of the children.

{¶ 12} A.H. testified that when S.H. first arrived at their home she was very withdrawn and quiet and was doing poorly academically due to absenteeism. Conversely, twin J.H. was withdrawn and aggressive. She was doing well in school but had difficulty making friends. L.H. was very "clingy" and withdrawn and performed poorly in school. L.H. behaved more like a toddler than a six-year old.

{¶ 13} A.H. stated that in April 2014, supervised weekly visits between the children and parents commenced at LCCS. Thereafter, A.H. observed worsening behaviors of the children. S.H. had bad bedwetting incidents and nightmares. J.H. became "extremely aggressive," breaking windows and doors, having night terrors,

4.

defecating in her pants, threatening others, and having suicidal thoughts. She was hospitalized on multiple occasions. L.H. began "acting like a baby" wanting to be rocked all the time. She was also having nightmares and wetting her bed.

{¶ 14} A.H. testified that in March or April of 2014, she took the children to Lucas County's Children's Advocacy Center ("CAC") due to the children discussing multiple occasions of sexual abuse by their half-brother (mother's son) and half-uncle (father's brother), both minors. Once they began therapy, they started talking about the parents as sexual abusers as well. Following sessions at CAC, they were referred for outside therapy services at Zepf Center.

{¶ 15} A.H. testified that prior to therapy, the twins were acting out sexually with each other and with one of her children and their play was either violent or sexual. A.H. stated that in addition to the girls receiving therapy she has attended support services which help her redirect play, impose proper discipline, and deal with her emotions regarding the sexual abuse.

{¶ 16} A.H. testified that visitation with the parents ended in July or August 2014. She stated that the children were acting out with aggression, nightmares, and bed wetting; J.H. and L.H. did not want to go. She further explained that J.H.'s psychiatrist wrote a letter indicating that J.H. should no longer have visits due, in part, to her suicidal thoughts. A.H. stated that the behaviors all improved once visitation ceased. Specifically, aggression had been reduced, bedwetting and nightmares were nearly

5.

nonexistent, the girls' grades had improved, and they were engaging in appropriate peer relationships. A.H. testified that she and uncle were willing to adopt all three girls.

{¶ 17} A.H. was questioned about the sexual abuse by the half-brother and half-uncle. She stated that she asked father if he knew about the abuse by the girls' brother, he indicated that the girls told him, but that he did not pursue it because he is the mother's son. A.H. further indicated that the mother knew of the sexual abuse by the half-uncle but did nothing because it was father's brother.

{¶ 18} Dr. Randall Schlievert, pediatrician and expert in child sexual abuse, testified that he separately evaluated J.H. and S.H. in April 2014, to determine if they had been sexually abused. In October 2014, Schlievert evaluated L.H.

{¶ 19} Schlievert testified that to a reasonable degree of medical certainty, his opinion was that the children had all been sexually abused and they should not be returned to their parents. During cross-examination, Dr. Schlievert was questioned about the fact that the criminal charges against father were dismissed; he stated that his opinion and recommendation remained unchanged. Schlievert further explained that there was a "bigger picture" which included sexual abuse by other family members and a third individual while the children were under the parents' care. His detailed reports were admitted into evidence.

{¶ 20} LCCS caseworker, Rhonda Nicholson, testified that the family had prior involvement with LCCS, 28 referrals with eight of them substantiated. When she

6.

received the case in January 2014, the goal was reunification and the main concerns were substance abuse, housing, neglect, and sexual abuse by the half-brother and half-uncle.

{¶ 21} Nicholson testified that father completed his diagnostic assessment and that no services were recommended. It was, however, suggested that he attend sober support groups. He was required to establish housing and take parenting classes. Nicholson stated that parenting class referral never happened because father and mother were arrested in October 2014.

{¶ 22} Nicholson testified that father had housing in the form of the back part of a duplex owned by his mother. Nicholson stated that she was concerned about the arrangement because grandmother did not believe the children's sexual abuse allegations.

{¶ 23} Nicholson stated that LCCS decided to file its motion for permanent custody because the parents were incarcerated on charges of sexual abuse against the children. Nicholson stated that she believes awarding permanent custody to LCCS is in the children's best interests due to the sexual abuse allegations, substance abuse concerns, disclosures that were made, and that the mother is still incarcerated. Nicholson testified that the fact that father is no longer in jail and the charges were dismissed did not change her opinion due to the disclosures by the children. She stated that the girls have bonded with their caregivers, have stability, and their needs are being met.

{¶ 24} Regarding father, he was released from jail on June 30, 2014. Nicholson stated that he may have tried to contact her on July 2, but that, ultimately, she called him on July 7, and asked father if he was coming to see her. According to Nicholson, father

7.

had just left a pretrial hearing of mother's across the street from her office. Father said he would come over if Nicholson wanted him to; they did meet.

{¶ 25} Nicholson testified that while the parents were incarcerated, they did not send any letters inquiring of the welfare of the children. When Nicholson visited the parents in jail, sometimes they would ask about the children, other times Nicholson would raise the subject. Nicholson testified that the parents contacted each other while in custody. She stated that father sent mother several love letters and a lock of his hair; mother was not receptive to the gestures.

{¶ 26} The Guardian ad Litem ("GAL") testified that he was appointed in February 2014, and had seen the children monthly at the caregivers' home and had observed visitation with their parents. He stated that in conducting his investigation he interviewed the children separately, attended court hearings and case plan reviews, attended meetings at the Zepf Center, met with the parents in jail, and made multiple telephone calls. The GAL stated that he recommended that permanent custody of the children be awarded to LCCS. He further stated that aunt, A.H., and uncle, J.H. would be appropriate adoptive parents. He further noted that the fact that father was released from custody and the charges were dismissed did not alter his recommendation.

{¶ 27} On August 7, 2015, the trial court granted LCCS' motion for permanent custody and terminated mother's and father's parental rights. The court found that LCCS made reasonable efforts to reunite the children with their parents. The court further found that, as to father, he failed to remedy the conditions which caused the removal of

8.

the children, R.C. 2151.414(E)(1), he demonstrated a lack of commitment to the children, R.C. 2151.414(E)(4), he committed abuse or allowed the children to suffer neglect, R.C. 2151.414(E)(15), and that a child sexual abuse expert concluded that the children were sexually abused and should not be returned to the parents, R.C. 2151.414(E)(16). Finally, the court found that it was in the children's best interests to award permanent custody to LCCS for adoptive placement. Father then commenced this appeal and raises the following two assignments of error for our review:

> I. The trial court erred by finding that Lucas County Children Services exercised reasonable efforts to reunify the children with their father, when the goal of case plan services was reunification in October 2014 prior to father's unreasonable incarceration, but had changed to permanent custody in June 2015 when all charges against him were dismissed, and when he had substantially completed his case plan services before his unreasonable incarceration.

> II. The court's grant of permanent custody to LCCS was against the manifest weight of the evidence as to father, [J.H.].

{¶ 28} Because appellant's assignments of error are related, they will be jointly addressed. Father questions whether LCCS made reasonable efforts to prevent the continued removal of the children from his home and whether the trial court's judgment terminating his parental rights was supported by the evidence.

9.

**{¶ 29}** Both of these issues challenge the weight of the evidence. A trial court's judgment will not be overturned as against the manifest weight of the evidence if the record contains competent credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements to terminate parental rights have been established. *In re S.,* 102 Ohio App.3d 338, 344-45, 657 N.E.2d 307 (6th Dist.1995).

**{¶ 30}** The disposition of a child determined to be dependent, neglected or abused is controlled by R.C. 2151.353, and the court may enter any order of disposition provided for in R.C. 2151.353(A). Before the court can grant permanent custody of a child to a public services agency, however, the court must determine: (1) pursuant to R.C. 2151.414(E) that the child cannot be placed with one of his parents within a reasonable time or should not be placed with a parent; and (2) pursuant to R.C. 2151.414(D), that permanent commitment is in the best interest of the child. R.C. 2151.353(A)(4). R.C. 2151.414(E) provides that, in determining whether a child cannot be placed with a parent within a reasonable time or should not be placed with a parent, the court shall consider all relevant evidence. If, however, the court determines by clear and convincing evidence that any one of the 16 factors listed in the statute exist, the court must find that the child cannot be placed with a parent within a reasonable time or should not be placed with a parent. Those factors include, in relevant part:

> (1) Following the placement of the child outside the child's home
> and notwithstanding *reasonable case planning and diligent efforts by the*

10.

*agency* to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

* * *

(15) he parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.

(16) Any other factor the court considers relevant. (Emphasis added.) R.C. 2151.414(E).

{¶ 31} Clear and convincing evidence is that proof which establishes in the mind of the trier of fact a firm conviction as to the allegations sought to be proven. *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118 (1954).

{¶ 32} In determining the best interests of the child, R.C. 2151.414(D)(1) directs the court to consider all relevant factors, including, but not limited to:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period and, as described in division (D)(1) of section

12.

2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶ 33}** As to the efforts made by LCCS to aid father in regaining custody of his children we note that the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute. *In re Savannah J.,* 6th Dist. Lucas No. L-08-1123, 2008-Ohio-5217, ¶ 40, citing *In re Myers,* 4th Dist. Athens No. 02CA50, 2003-Ohio-2776, ¶ 18. A "reasonable effort" is an "honest, purposeful effort, free of malice and the design to defraud or to seek an unconscionable advantage." *In re Weaver,* 79 Ohio App.3d 59, 63, 606 N.E.2d 1011(12th Dist.1992). The record supports a finding that the agency made reasonable efforts. Specifically, LCCS provided the parents with case plan services to address the issues that caused the children's removal. Although many of the issues involved the mother, father failed to promptly obtain a diagnostic assessment and continued to support the mother to the detriment of his children. Further, throughout the proceedings, the court made multiple findings that LCCS had made reasonable efforts to reunite the family. No objection to the findings was made. Although the court specifically

13.

concluded that LCCS had made reasonable efforts, it was not required to do so in a permanent custody proceeding. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816. However, as quoted above, the reasonable efforts of the agency is a consideration under a finding under R.C. 2151.414(E)(1), which the court made. *Id.* at ¶ 42.

{¶ 34} Regarding the R.C. 2151.414 factors, under (E)(1) we note that the evidence at the hearing showed that father continued in an unhealthy relationship with mother and did not have proper housing. Father's failure to regularly support, visit, or communicate with the children, especially his lack of follow-up after release from jail supports the court's finding under factor (E)(4). Under (E)(15), according to the children, father was a perpetrator of sexual abuse against them. Even assuming he was not, he admitted that he was aware of sexual abuse in the home yet he did nothing to protect his children. Also, he supported mother throughout her criminal proceedings. Finally, under (E)(16), and as the trial court found, Dr. Randall Schlievert, a child sexual abuse expert, testified that the children had been sexually abused and that they should not return to their parents.

{¶ 35} The record, therefore, supports the lower court's findings that LCCS made reasonable efforts to reunite father and children and that the children cannot be placed with father within a reasonable time and should not be placed with father. Further, the evidence supported the court's finding that it was in the children's best interests to award permanent custody to LCCS. The children expressed a desire to be adopted by the

14.

caregivers with whom they have bonded and where there is stability and their needs are being met. Father's first and second assignments of error are not well-taken.

{¶ 36} On consideration whereof, we find that substantial justice was done the party complaining and the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Pursuant to App.R. 24, appellant is ordered to pay the costs of this appeal.

Judgment affirmed.

Mark L. Pietrykowski, J.                    _____
                                            JUDGE
Thomas J. Osowik, J.

James D. Jensen, J.                         JUDGE
CONCUR.

                                            _____
                                            JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.