[Cite as *In re W.E.*, 2021-Ohio-1069.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re W.E.                                        Court of Appeals No. L-20-1183

                                                  Trial Court No. JC 18270800

                                                  **DECISION AND JUDGMENT**

                                                  Decided:  March 31, 2021

* * * * *

Sarah Anjum, for appellant.

Janna E. Waltz, for appellee.

* * * * *

**MAYLE, J.**

{¶ 1} A.M., the mother of W.E., appeals the October 21, 2020 judgment of the

Lucas County Court of Common Pleas, Juvenile Division, terminating her parental rights

and granting permanent custody to appellee, Lucas County Children's Services.  For the

following reasons, we affirm the trial court judgment.

## I. Background

{¶ 2} W.E. was born to A.M. in September of 2018.[1] A.M. was 16 years old at the time of W.E.'s birth. She had been in the care of Lucas County Children's Services ("LCCS") since she was four and in its permanent custody since 2010.

{¶ 3} Four days after W.E. was born, LCCS filed a complaint in dependency and motion for shelter care hearing. LCCS requested that A.M. and W.E. be placed together at Mustard Seed, a group home in Dayton, Ohio, that provides various case management services for minor mothers and their children. A.M. was in agreement with this placement. The court awarded LCCS interim custody of W.E. and appointed W.E. a guardian ad litem ("GAL").

{¶ 4} W.E. was found to be dependent on November 28, 2018, and LCCS was awarded temporary custody. A case plan was filed with a goal of reunification. Temporary custody was extended in judgments dated October 24, 2019, and April 14, 2020. An amended case plan was filed.

{¶ 5} On July 9, 2020, LCCS moved for permanent custody. It alleged that W.E. cannot be placed with either parent within a reasonable time (R.C. 2151.414(B)(1)(a)); W.E. has been in the temporary custody of the agency for more than 12 of the preceding 22 months (R.C. 2151.414(B)(1)(d)); the parents continuously and repeatedly failed to remedy the conditions that led to W.E.'s placement outside the home insofar as A.M. had

---

[1] The identity of W.E.'s father was not ascertained.

2.

not engaged in needed mental health services (R.C. 2151.414(E)(1)); A.M. has demonstrated a lack of commitment toward W.E. because although she visits with W.E. regularly, she failed to engage in necessary case plan services (R.C. 2151.414(E)(4)); and W.E. is doing well in foster care and is need of a legally secure, permanent placement (R.C. 2151.414(D)(1)).

{¶ 6} LCCS alleged that permanent custody was in W.E.'s best interest because (1) A.M. had not engaged in mental health services for approximately one year; (2) A.M. frequently went away without leave from various foster placements and had disrupted numerous placements because of behavioral issues; (3) A.M. was arrested for solicitation on June 15, 2020, and she attempted suicide while incarcerated; (4) there were concerns that A.M. was being trafficked; and (5) A.M. would turn 18 one week later.

## A. The Case Plan

{¶ 7} The case plan devised for A.M. identified the agency's concerns, along with corresponding changes that it expected A.M. to make:

Concern 1: [A.M.] has been in LCCS care since the young age of 4. Her cases has [sic] been substantiated and indicated for Neglect [sic], physical abuse as well as sexual abuse.

Expected change: Any emotional or behavioral issues will be addressed and stabilized through counseling services.

Concern 2: [A.M.] has an extensive history of violence and disrespectful behavior towards adults and her own peers.

3.

Expected change:  Any emotional or behavioral issues will be addressed and stabilized through counseling services.  Mother will learn to manage her emotions and not lash out verbally or physically towards others.

Concern 3:  [W.E.] is a newborn child born to a minor mother.  While mother was pregnant with [W.E.] she reportedly used marijuana for a short period of time.

Expected change:  Mother will understand the developmental needs and milestones for her child.  Mother will address areas of concern [W.E.] may have.  Mother will continue to nurture and meet all her basic needs.

{¶ 8} The case plan called for A.M. to engage in counseling services to address areas of concern, including traumatic events that have occurred in her life, to follow recommendations of the service provider, including participating in additional evaluations, and to make W.E. available for all medical and developmental appointments and address her needs.

### B.  The Trial on LCCS's Motion for Permanent Custody

{¶ 9} A trial took place on LCCS's motion on October 8, 2020.  The following witnesses testified:  (1) Kim Casdorph, the LCCS ongoing caseworker currently assigned to the case; (2) Ann Baronas, W.E.'s GAL; (3) A.M.; (4) Audrey Sweeney, A.M.'s most recent GAL; (5) Mary Niederhauser, a community detention manager with Lucas County

4.

Juvenile Court; and (6) Jennifer Wakefield, a community case manager at Grace Haven. Their testimony is summarized below.

## 1. Kim Casdorph

{¶ 10} Kim Casdorph is an ongoing caseworker employed by LCCS. LCCS became involved in this matter because at the time A.M. gave birth to W.E., LCCS had permanent custody of A.M. The agency was concerned because A.M. had mental health issues for which she began receiving services at around age seven or eight, she was unstable in her foster placements and moved around a lot, she had a history of criminal assault charges, she used marijuana, and at some point she became involved in human trafficking.

{¶ 11} LCCS established a case plan for A.M. to include mental health services for her previously-diagnosed mental health conditions, including attention deficit and hyperactivity disorder ("ADHD"), oppositional defiant disorder ("ODD"), anger, post-traumatic stress disorder ("PTSD"), and depression. The goal of the case plan was reunification.

{¶ 12} A.M. and W.E. were initially placed together at Mustard Seed in Dayton, Ohio. There, A.M. could be with W.E. while at the same time obtaining services for mental health concerns and independent living. That placement disrupted, however, due to A.M.'s behavior. A.M. and W.E. returned to Toledo. They remained together at two subsequent placements, but both disrupted due to A.M.'s behavior. After that, LCCS could not find a placement that would take both of them.

5.

{¶ 13} During her relationship with LCCS, A.M. moved almost 100 times. Many of her placements disrupted due to her behavior. After W.E. was removed from A.M.'s care, A.M. continued to have disruptions—at least three more before she emancipated in July of 2020. The last placement disrupted because A.M. was threatening, yelling, screaming, cussing, and not following house rules. A.M. also had a history of going AWOL ("away without leave") from her placements. These AWOLs demonstrate instability and a failure to follow basic house rules. Additionally, when A.M. went AWOL, LCCS did not know where she was.

{¶ 14} A.M. completed a mental health assessment for the agency at Zepf in April of 2019, but the assessor left his or her employment without entering the results. The agency requested a new assessment, but A.M. refused to participate. She said that she has reported her life story to several different people and did not want to do it again. A.M. told Casdorph that she does not need mental health services and she is not open to taking medications. Casdorph believes that A.M. needs mental health services because she has exhibited behaviors that are linked to her mental health, including angry outbursts, reactivity, and an inability to focus to get things done. She has a juvenile criminal history that includes disorderly conduct in 2014, 2015, and 2019; assaults in May and August of 2015, two assaults in Lucas County in June of 2016, and assaults in Cuyahoga County, Wayne County, and one while at Mustard Seed; a 2017 civil protection order; and receiving stolen property in 2017.

6.

{¶ 15} In 2020, while AWOL from one of her placements, A.M. was charged with solicitation. Local detectives found A.M. on a trafficking website, sought to meet up with her, and arrested her. That's how her whereabouts became known to LCCS. While detained on the solicitation charge, A.M. attempted suicide.

{¶ 16} Despite refusing to complete a second assessment for LCCS, A.M. completed one for the Lucas County Juvenile Court on August 6, 2020, in connection with the solicitation charge. Because the assessment was completed for the juvenile court and not for LCCS, LCCS was not able to communicate its concerns to the assessor as it would typically do on the referral sheet.

{¶ 17} In addition to her concern that LCCS was unable to provide input to the assessor, Casdorph testified that A.M. relayed inaccurate information to the assessor: she said she had no children; she refused to disclose the reason for her arrest, saying that it was embarrassing and unrelated to her mental health; she denied suicidal or homicidal ideations even though she attempted suicide during her detention; she denied legal involvement after 2016; she refused to grant the assessor permission to look at public records; and she did not discuss with the assessor her problems with anger management. A.M. did disclose that she uses marijuana daily and her urine screen tested positive for marijuana.

{¶ 18} Following the assessment, no mental health services were recommended. Casdorph worries that the overall assessment did not accurately reflect A.M.'s current mental health functioning. The assessor did not know that A.M. had children, let alone

7.

that LCCS was involved. Casdorph believes it likely that services would have been recommended had A.M. provided accurate information.

{¶ 19} When A.M. did receive mental health treatment following W.E.'s birth, she kept only a handful of the appointments. Casdorph is concerned because LCCS is aware of A.M.'s solicitation charge and the additional traumas that A.M. has suffered. She believes that A.M. may still be involved in human trafficking because some of her acquaintances are known to be involved in trafficking. LCCS wants to ensure that A.M.'s mental health is being addressed and that she has the support she would need as a parent and to be successful in life. Casdorph observed that A.M. does well for periods of time, then goes off track. When she is off track, W.E. could be exposed to inappropriate behavior. For instance, because some of A.M.'s criminal charges occurred in public, W.E. could be injured in an altercation. And if A.M. were to go to jail someday, W.E. could be alone with no parent to care for her. Casdorph emphasized that A.M.'s disruptions have caused disruptions for W.E. too; W.E. is on her sixth placement.

{¶ 20} Casdorph is aware that A.M. participated in independent living programming through the case plan. When she emancipated, those services were completed. A.M. is now involved in the Bridges program and is compliant, but Casdorph commented that it is possible that she may become ineligible to stay in Bridges. She acknowledged that A.M. currently has housing, but it is a one-bedroom apartment with no bed for W.E. Casdorph does not know how A.M. pays utilities, but she knows that A.M.'s first three months' rent were paid through a stipend from the agency. Despite the

8.

fact that A.M. has housing, Casdorph is concerned about A.M. being able to keep a roof over W.E.'s head, particularly given that A.M. is just coming out of foster care where everything was provided and she has never had to pay rent herself.

{¶ 21} A.M. is enrolled in school and will graduate in December of 2020. She is on an IEP for behavioral problems. She is employed at Kroger, working third shift. She is almost eligible for the union. Casdorph has not discussed with A.M. her plan for daycare, but she is concerned about who will care for W.E. while A.M. is working, going to school, and meeting other obligations.

{¶ 22} A.M. visits weekly with W.E. at the agency, but has more frequent contact than that because W.E.'s foster parents have facilitated outside visits. A.M. provides snacks and food when she visits. But Casdorph testified that A.M. missed visits when she was AWOL, and she has not had unsupervised visits. While A.M. and W.E. lived together at Mustard Seed, A.M. was on 15-minute checks because of her behaviors. Casdorph stated that she has no concerns about A.M.'s contact with W.E., but she also talked about an incident where A.M. brought W.E. a cell phone that had emails from solicitation websites on it and inappropriate photos of A.M.

{¶ 23} W.E. has been in her current foster placement for almost a year and is very bonded with the foster parents, their two children, and the other foster child in the family's home. W.E. is intelligent and she has no special needs. A.M. has a relationship with the foster mother and they are in contact almost daily. She discusses things with the

9.

foster mother about W.E. and other life choices. The current foster parents are willing to adopt and to allow A.M. to be part of W.E.'s life.

{¶ 24} Casdorph testified that in June of 2020, A.M. told W.E.'s foster parents that she wished for them to adopt her. Casdorph believes that permanent custody is in W.E.'s best interest. She will have a stable home, but will still have contact with A.M. Casdorph does not believe that A.M. can provide a safe, stable, permanent environment at this point and no appropriate relative placements have been identified.

{¶ 25} On cross-examination, Casdorph conceded that A.M. was in foster placements where care providers hit the kids and cussed and yelled at them. The abusive behavior A.M. encountered in foster homes could account for the assaultive behaviors she has displayed. Casdorph said that the mistreatment A.M. experienced in her foster homes is part of the reason LCCS wants A.M. to participate in mental health services. She acknowledged that A.M.'s receiving stolen property charge, the 2019 disorderly conduct, and the solicitation charges were dismissed. She has no concerns about drug use except marijuana, and W.E. was born drug-free. She agreed that A.M. has had no assault charges since 2016. But Casdorph believes that even though A.M. has had no further assault or disorderly conduct charges, this does not mean her behavior has improved.

{¶ 26} Casdorph acknowledged that A.M. and W.E. had been with a foster parent who dropped them off at LCCS and left them there saying she wanted no further part in fostering, but she claimed that this was due to A.M.'s behavior. In a "sterile visitation room," Casdorph observed no problems with A.M.'s parenting. She recognized that

10.

A.M. completed multiple parenting classes, and A.M. was with W.E. at Mustard Seed for the first ten months of W.E.'s life. LCCS never received any negative information about her parenting there. A.M. gives W.E. appropriate food and gifts. She has missed some visits with W.E., but Casdorph conceded that some of the missed visits were due to A.M.'s foster mother's inability to transport her to visitation.

{¶ 27} Casdorph also acknowledged that A.M. completed a lot of packets for Independent Living and built up enough money in that program to pay her first three months' rent and buy furniture. She has lived in her own apartment since July. When Casdorph visited, the utilities were on and the house was clean. Casdorph complained, however, that A.M. had nothing there for W.E.—she said sometimes parents have things for the child in preparation for regaining custody.

{¶ 28} A.M. receives food stamps. Casdorph acknowledged that A.M. participates in Bridges, which can continue to help her as needed until age 21, so long as A.M. is going to school or working 30 hours a month. A.M. has been working at Kroger since April of 2020. Kroger allowed A.M. to return to work after her juvenile detention.

{¶ 29} Casdorph was cross-examined at length about the most recent assessment performed by Zepf. The assessor marked "no concerns" for psychosocial, family and developmental history. Casdorph conceded that when Zepf performed the 2020 assessment, it had a prior assessment of A.M. from January of 2016, yet it still recommended no additional services.

11.

{¶ 30} According to the 2020 assessment, A.M. denied experiencing mental health symptoms since her last assessment, and she attributed her improvement to the fact that she is getting older. She acknowledged having problems with anger management, but she told the assessor that she was able to calm and redirect herself now that she has her own place where she can be away from others. She also acknowledged that she used to be reactive and impulsive, but said that she has started to think before acting.

{¶ 31} The 2020 assessment also notes that A.M. was assessed for intermittent explosive disorder, but A.M. denied symptoms pertinent to that diagnosis. Casdorph recognized that because of her 2016 assessment, which diagnosed her with ADHD, this diagnosis was again explored. A.M. told the assessor that being on her own has curbed her former symptoms. Other diagnoses from 2016—ODD and PTSD—were also ruled out because A.M. denied having symptoms in the last six months.

{¶ 32} A.M. disclosed to the assessor that she received therapy services when she was younger, and said that she is not opposed to therapy if it is recommended, but she told the assessor that she has been able to keep a job for a year without her mental health negatively impacting her coworkers, her work, or her ability to provide customer service. The assessor noted that while A.M. expressed interest in therapy, she provided no information that would allow the assessor to make a mental health diagnosis warranting therapy services at Zepf.

{¶ 33} On redirect, Casdorph complained about inaccuracies in the August 2020 assessment. A.M. reported at the 2020 assessment that she has no ODD symptoms, but

12.

Casdorph believes that this statement is inconsistent with A.M.'s behaviors. A.M. also reported that she had exhibited no explosive behaviors, however, Casdorph testified that there was a "blow up" on July 4 involving A.M. and W.E.'s foster parents. Casdorph said that A.M. never really successfully completed services on the case plan. And given that A.M. does not think she needs counseling, refuses medication, and does not want to tell her story—and because her mental health is the overwhelming concern for the agency—Casdorph believes that there is nothing else the agency can offer her to attempt to reunify her with W.E.

### 2. J.B.

{¶ 34} J.B. is W.E.'s foster mother. W.E. has been with her since the week before her first birthday. W.E. lives with J.B., J.B.'s husband, son, and daughter, and another foster son. She and her husband are willing to adopt W.E., and if A.M. remains a positive person in W.E.'s life, she would allow A.M. to continue contact with W.E.

{¶ 35} J.B. communicates with A.M. often on the phone and via text—at least every couple of days. She testified about a visit between A.M. and W.E. that took place in the community. A.M. wanted to do a photo shoot. They got the visit approved by the caseworker, but A.M. canceled. The shoot was rescheduled two weeks later. A.M. was supposed to be in the pictures with W.E., but when she got there, she said that she had just come from work and did not have time to change her clothes.

{¶ 36} A.M. initiated two conversations with J.B. about her adopting W.E. A.M. asked J.B. if she would be willing to do this. After speaking with her husband, J.B. told

A.M. that they would be willing to adopt. A.M. raised the topic again in the spring of 2020. Again, J.B. told her that they would be willing to adopt W.E. and would allow A.M. to stay in W.E.'s life. Later, A.M. told J.B. that she changed her mind about wanting J.B. to adopt W.E.

{¶ 37} J.B. testified that A.M. buys things for W.E. She has bought her body wash, lotion, diapers, coats, clothes, boots, tennis shoes, and toys. In the summer of 2020, after her incarceration, A.M. brought W.E. a phone. J.B. noticed that pictures had not been deleted from the phone. They were provocative photos of A.M., unclothed, that appeared to have been taken at a hotel. There were also inappropriate internet sites on the phone that had not been cleared.

{¶ 38} J.B. agreed that A.M. has always been appropriate with her and with W.E. She has no concerns about A.M.'s caregiving. She was asked if she has ever seen A.M. display anger, and she said that she had twice—in two Facebook live videos. The first one took place at the end of 2019. In the video, which lasted an hour and 20 minutes, A.M. was "ranting and raving," and talking about fighting. The second video was in spring of 2020. A.M. talked in the video about being unhappy because she was pregnant. She also mentioned that she was being prostituted and complained that she was not making enough money doing that. J.B. notified W.E.'s GAL.

### 3. Ann Baronas

{¶ 39} Ann Baronas is W.E.'s GAL. She testified that A.M. regularly visits with W.E., but there were times in the past when her attendance was sporadic. Baronas's

14.

experience with A.M. is that her behavior goes up and down. A.M. can "hold it together" for some time, then something will happen and she will be "off the rails" again. Baronas conceded that A.M.'s behavior seems better than it was before giving birth to W.E.

{¶ 40} Baronas is concerned that A.M. has not completed mental health services. She has not had mental health services since she was 14 even though she knew she needed to "keep it together" for W.E. She has historically been noncompliant in obtaining mental health services.

{¶ 41} With respect to A.M.'s most recent assessment, Baronas is concerned that A.M. told the assessor she has no children and that she failed to be honest about issues she's faced in the past and is currently facing. She admits that in conducting A.M.'s most recent assessment, Zepf was aware of her 2016 assessment, yet still recommended no services.

{¶ 42} Baronas saw A.M.'s Facebook live video in May. A.M. was in a bathroom, "absolutely beside herself," screaming, yelling, and pacing. She was talking about being pregnant and not being happy about it. She said she was prostituting and her pimp was not getting enough money for her work. While Baronas is concededly not a mental health professional, it appeared to her that A.M. was having a breakdown.

{¶ 43} Baronas discussed the video with A.M. A.M. said that she was not pregnant—that she had had a miscarriage and did not think she was ever really pregnant. A.M. denied being impregnated by her pimp or a customer. Nevertheless, Baronas is

15.

concerned that A.M. is still trafficking.  She also indicated concern over the incident involving the phone A.M. gave to W.E.

{¶ 44} With respect to W.E. being with A.M., Baronas worries that A.M. lacks stability, has ongoing untreated mental health issues, and is resistant to taking medication.  Baronas conceded that A.M.'s lack of stability is not entirely her own fault, but she feels that W.E. needs someone that she can depend on.  Although A.M. may be showing the very beginnings of stability, without mental health services, she sees no alternative for W.E.  A.M. has not had W.E. for the better part of 18 months, and when they were placed together in foster care, it did not work out well because of A.M.'s behaviors and disruptions.  Baronas admitted that A.M. now has independent housing, and she has no concerns with A.M.'s housing.

{¶ 45} W.E. is doing well in her current placement.  Her needs are being met and she is bonded to her foster family.  They are willing to adopt her, and Baronas believes that W.E. needs stability and is not safe with A.M.  Baronas recommends that permanent custody be awarded to LCCS and that adoption placement and planning be pursued for W.E.

### 4.  A.M.

{¶ 46} A.M. turned 18 years old on July 17, 2020.  She has lived independently since July 29, 2020, when she obtained an apartment with stipend money she received through Lucas County Independent Living.  She earned the stipend money between the ages of 14 and 18 by doing classes—like parenting and cooking classes—and completing

packets. She saved up $4,000 that can be used for rent, deposit, furnishings, utilities, and groceries. Independent Living terminated when she emancipated. At that point, she enrolled in Bridges, a program for young adults ages 18 to 21. Bridges helps pay living expenses. To be eligible, you have to work or go to school 80 hours a month. Bridges does not pay for utilities or furnishings.

{¶ 47} A.M. has been employed at Kroger in Maumee for seven months. She works 30 hours a week at $10.25 per hour. She will soon be eligible to join the union and will get a raise to $11 per hour after 60 days in the union. A.M. intends to continue working after getting custody of W.E. She said that JFS can help with daycare. She is not sure exactly how it will work given that she works third shift; she is hoping to change shifts.

{¶ 48} As far as her ability to pay for food and daycare, A.M. receives food stamps and is accumulating money in her bank account. She is scheduled to graduate from Glass City Academy in December of 2020. She is studying to be a state tested nursing assistant through Touch of Hearts and Saving Lives. A.M. does not have a driver's license, but she has her temporary permit. She will take her driving test this month.

{¶ 49} A.M. admitted that she missed intake appointments at Zepf. She said that she did not always have transportation because her foster mom did not take her and wanted her to figure out everything by herself. She admitted that there were some days it was her own fault.

17.

{¶ 50} In terms of her criminal record, A.M. explained that in foster care, she was exposed to a lot of things at a young age for a long time, and certain behavior started to become normal. She was aggressive because that is what she was brought up around. She was in 13 foster homes and six group homes. She was abused and watched other kids get abused. The environment was not always positive, and she was always with older kids in the foster homes. She recognizes that she has PTSD and knows she has to work on that.

{¶ 51} A.M. has come to the realization that she has cut people off and this was not good for her. She describes that she was in a dark hole, and she was around girls who were influencing her. Now she is on her own and no longer in a stressful, negative environment. She feels at peace and says she now has a safe space in her apartment. She no longer has to run away.

{¶ 52} A.M. recognizes that she made poor choices that she regrets. She thinks her last arrest and being on house arrest got her on the right track and opened her eyes. She insists that she has let go of people that put her in the dark hole. Now that she is on her own, they do not know where she is or how to contact her.

{¶ 53} On cross-examination, A.M. was questioned about how she would afford rent and daycare at her salary. She acknowledged that her rent is $650 and her income is approximately $1,200 per month. She researched the cost of daycare and found it to be $100 per week. She says she has enough money, despite the fact that rent and daycare

18.

will consume much of her paycheck. A.M. explained that she is also training on YouTube to do eyelash extensions, which will provide additional income.

{¶ 54} A.M. insisted that she provided accurate information at her 2020 assessment. She admitted to the assessor that she uses marijuana in the morning and at night to get an appetite. She said that she will not use marijuana if she has her daughter and intends to stop anyway because she wants to become a nurse. She last smoked two weeks ago.

{¶ 55} As for A.M.'s failure to disclose to the assessor that she has a child, A.M. explained that she omitted this information because she was there to be assessed for mental health issues—not to talk about W.E. She believes her reporting was accurate given that she did not have her child at the time. She also acknowledged that despite having been charged with solicitation, she reported to the assessor that she had not exchanged sexual favors for resources—she insisted that she did not plead to that charge. She conceded that she gets angry sometimes, but denied that she has anger management problems. Now she uses music, deep breathing, and other coping mechanisms to calm herself.

{¶ 56} A.M. denied telling the assessor that the solicitation charge was her first charge. She conceded that there was a time when she was in court a lot, but she said there was a big gap between charges. She claimed that she became invested in her mental health when she got pregnant. She did not recall telling the assessor that she has not been fully invested in her mental health since age 12. She recalled saying that she

19.

was tired of getting new therapists—telling her life story and trusting therapists—then having them leave and having to tell a new person.

{¶ 57} A.M. explained the suicide attempt when she was most recently in custody. She said that she realized she was in deep trouble. The custody case was pending and she felt that she would never get custody of her daughter. She did not recall whether she told the assessor about it, however, she does not think that it is important because it was the only time she tried to harm herself and she did not want to be diagnosed with something that was not actually a problem.

{¶ 58} As to her previous diagnoses, A.M. denied having ODD symptoms in the last six months. She disagreed that she behaved defiantly in foster care—she insisted that she was just trying to be heard and expressing how she felt. She agreed that she got into fights at foster care, but she said that families argue. She denied ever getting physical with any foster parent, but she conceded that she got into fights with other foster children. A.M. also agreed that she has PTSD from past abuse. She tried working on it in mental health services for years and kept getting flipped to different therapists, so she gave up. She still feels like she suffers from PTSD and is open to working on it. She does not think she *needs* it, but she agreed it would help.

{¶ 59} A.M. admitted that she has never cared for W.E. in her own home, but she insisted that she cared for W.E. by herself for months at Mustard Seed. She denied that they checked on her every 15 minutes; she claimed that the staff did not watch her or

20.

monitor her. Her visits with W.E. are an hour every week. She denied that she has not spent significant periods alone with her—she had her alone for ten months.

{¶ 60} In response to questioning by the GAL, A.M. agreed that Casdorph and Baronas went to her home two days before trial. She denied that she does not have a bed for W.E.—she said that she has a full bed from LCCS and has ordered a queen bed. She initially did not get a two-bedroom apartment because she was told she had lost permanent custody of W.E., but she will pay the transfer fee to get a two-bedroom. She claimed that she has clothing and toys for W.E. She does not have a car seat, but she will get one.

{¶ 61} A.M. agreed that she told Casdorph and Baronas that she has not been in mental health services since she was 14, but denied saying that she does not believe in it—she said only that she was tired of starting over with new therapists. She is not in counseling or on medications right now. She did not like being on medications.

{¶ 62} As for her pregnancy in May 2020, A.M. explained that she was not happy about it because she was not happy with the father. She acknowledged going on Facebook live and expressing that she did not like what the baby's father was saying about her. She claimed the video lasted 30 minutes, not an hour. She denied ranting the whole time—she said she laughed too.

{¶ 63} A.M. revealed W.E.'s father's name. She said that he was not involved with the case because he does not care and did not want to pay child support. She claimed that she gave his name to caseworkers. She admitted that she talked to J.B.

21.

about adoption. She wanted to know if J.B. and her husband would take W.E. if she lost permanent custody. She felt they had a safe home where she knew W.E. would not be abused. Nevertheless, she believes that she is best for W.E. She can take care of W.E., she has never abused her, there are no hygiene problems, she is physically able to care for her, and she and W.E. love each other.

{¶ 64} With respect to her disruptions from foster placements, A.M. denied that her placement at Mustard Seed was disrupted because of her behavior. She insisted that they wanted her to leave because she was "snitching" on them for not having food and for being dirty. She explained that her foster mother—Alisha—quit foster care because she decided it was not what she wanted to do. One day Alisha picked her up from school, picked W.E. up, then dropped them downtown, turned around, and left. She went to Safety Net, then to the home of L.B. in Waterville. That placement was disrupted after L.B. found marijuana. She was next placed with S.G., who did not like her being there with her sister. And her last placement before emancipating was with I.P. She left because she emancipated. A.M. claimed that she and her foster parents were mutually responsible for the disruptions.

{¶ 65} A.M. denied that she has been waiting for W.E. for two years—she said that they were together for ten months. During that time, she woke up to her, went to sleep with her, saw her off for the day, and took care of her, all with no help. She emphasized that there had never been any complaints of abuse or neglect or about her being a bad mom. At Mustard Seed, she cooked for herself, got up on her own, changed

and fed her own baby, and paid for diapers herself. She insisted that she will provide W.E. with everything she needs. A.M. denied that she is far behind in school—she is 18 and a senior in high school. She admitted that she missed school before she got pregnant with W.E., but explained that she did not care then—now she has something to live for.

### 5. Audrey Sweeney

{¶ 66} Audrey Sweeney became A.M.'s GAL in June of 2020. There were concerns that A.M. was a victim of sex trafficking. She met with A.M. regularly and they talked on the phone. They had problems placing A.M. through LCCS. Sweeney worked with A.M. to identify independent housing and made sure she was progressing in school. Sweeney connected A.M. with Grace Haven, which helped with sex trafficking issues and assisted her in complying with mental health requirements. A.M. was very compliant and answered whenever they called. She did everything they asked her to do. A.M. had her final pretrial in August and the Safe Harbor requirements (necessary for dismissal of the solicitation charges) were successfully completed.

### 6. Mary Niederhauser

{¶ 67} Mary Niederhauser is employed at Lucas County Juvenile Court as a community detention manager. She worked with A.M. from June 30 to July 29, 2020, after A.M. was arrested for solicitation. A.M. was placed on community detention level 4—GPS monitoring. She was required to comply with house arrest, foster home rules, and LCCS requirements. The community detention department did not require A.M. to have a mental health assessment, but the court may have. A.M. was compliant in

23.

the community detention program and was successfully terminated from the program. She did everything that was asked of her.

{¶ 68} Niederhauser talked about the lack of support offered by A.M.'s foster mother. To begin with, she was indecisive about whether she would take A.M. home from detention. Niederhauser said that this had nothing to do with A.M.'s behaviors—it was because the foster mother did not want to be responsible for her. The foster mother said she did not have time for A.M. and made excuses why she did not want to take her.

{¶ 69} The foster mother ultimately took A.M., but A.M. missed certain appointments because her foster mother did not transport her. Niederhauser recalled that A.M. missed one or two appointments with her baby because of her foster mother. One of those times, A.M. called Niederhauser distraught because she was on an ankle monitor and could not leave for a visit. A.M. was trying to be compliant, but she knew that if she could not get a hold of the community detention department, she would not be able to leave for her visit with her baby. By the time A.M. got a hold of Niederhauser, the visit had already started and her foster mother still had not picked her up.

### 7. Jennifer Wakefield

{¶ 70} Jennifer Wakefield is a community case manager at Grace Haven. She met A.M. in June of 2020, and has met with her many times. Grace Haven works with people at risk for sex trafficking. LCCS and PATH (Partners Against Trafficking in Humans) referred A.M. to Grace Haven.

24.

{¶ 71} Grace Haven set goals and A.M. was required to work toward achieving them. A.M.'s goals were to continue school, seek out mental health services, get a job, stay out of trouble, and avoid negative relationships. A.M. got two part-time jobs within a week of being released from detention, before she was even asked. She is still employed and is attending school. She has stayed away from negative people, and she got housing through Bridges. As part of independent living, A.M. was required to set up utilities and get a checking account, both of which she did.

{¶ 72} A.M. made her own appointment for mental health services. Wakefield was on the phone line listening in case A.M. needed help because A.M.'s foster mom did not help her and scheduling her own appointments was a new thing for A.M. Wakefield went with A.M. to the appointment but was not permitted to sit in. A.M. was assessed for mental health issues and was told that she did not qualify for services. Wakefield said that she was surprised by the information indicating that A.M. did not tell the assessor that she has a child. She said that she would not have expected A.M. to provide inaccurate information to the assessor because A.M. seemed dedicated to getting help.

{¶ 73} A.M. told Wakefield about her anger issues, but Wakefield has not observed A.M. angry and was under the impression it was under control. She continues to work with A.M. and is allowed to do so through her twentieth birthday. A.M.'s path is in the right direction and she has done everything asked of her. Everyone involved in A.M.'s criminal case, including the prosecutor and judge, have been happy and proud of her and are looking forward to seeing her grow. A.M. has been through a lot.

25.

## C. The Trial Court Judgment

{¶ 74} In a judgment journalized on October 21, 2020, the trial court granted LCCS's motion, terminated A.M.'s parental rights, and awarded permanent custody to LCCS.

{¶ 75} The trial court found that W.E. cannot be placed with either parent within a reasonable time and should not be placed with either parent under R.C. 2151.414(B)(1)(a). The court found that under R.C. 2151.414(D)(1), it is in W.E.'s best interest to grant permanent custody to LCCS and it would be contrary to her best interest to be reunified with either parent. It found that under R.C. 2151.414(E)(1), notwithstanding reasonable case planning and diligent efforts by LCCS to assist the parents to remedy the problems that initially caused the child to be placed outside the home, A.M. has failed to make significant progress in her case plan services. It further found that under R.C. 2151.414(E)(2), chronic mental or emotional illness, intellectual or physical disability, or chemical dependency of the parent is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time, and, as anticipated, within one year after the court holds the hearing. Specifically, it found that A.M. has chronic mental and emotional health concerns and has failed to engage in mental health services regularly, and her mental health remains untreated.

{¶ 76} As for W.E.'s best interest, the court found that under R.C. 2151.414(D)(1)(a), W.E. is in an appropriate foster home that is meeting all of her needs and is willing to adopt. Under R.C. 2151.414(D)(1)(c), W.E. has been in the temporary

26.

custody of LCCS for 12 or more months of a consecutive 22-month period. And under R.C. 2151.414(D)(1)(d), W.E. deserves a legally safe, secure, and permanent environment.

{¶ 77} A.M. appealed. She assigns the following error for our review:

> Lucas County Children Services did not prove by clear and convincing evidence that Mother failed to remedy the conditions that caused W.E. to be removed from her care; suffers from a chronic mental illness that is so severe that she is unable to parent W.E.; and should not and cannot have W.E. returned to her custody with a reasonable time.

## II. Law and Analysis

{¶ 78} In her sole assignment of error, A.M. does not challenge the trial court's R.C. 2151.414(D)(1) findings; rather, she challenges its R.C. 2151.414(E) findings. She argues that LCCS did not prove that she failed to remedy the conditions that caused W.E. to be removed from her care, that she suffers from chronic mental illness that is so severe that she is unable to parent W.E., and that she should not and cannot have W.E. returned to her custody within a reasonable time. A.M. maintains that she has stable housing, her mental health is stable and she continues to work on her mental health, she is employed, and her life is on track.

## A. Standard of Review

{¶ 79} R.C. 2151.414 provides the analysis that a juvenile court must undertake when considering whether to terminate parental rights and vest permanent custody in a children's service agency. Under that statute, the court must first find by clear and

convincing evidence that one of the circumstances described in R.C. 2151.414(B)(1)(a)-(d) exists.  Subsection (a)—the subsection relied on by the court—requires a finding that the child has not been abandoned or orphaned, has not been in the custody of a public children's services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent.  *In re E.B.*, 12th Dist. Warren Nos. CA2009-10-139, CA2009-11-146, 2010-Ohio-1122, ¶ 14-15.

{¶ 80} If—as here—the court finds that R.C. 2151.414(B)(1)(a) applies, it must consider both whether granting permanent custody to the agency is in the child's best interest *and* whether any of the factors enumerated in R.C. 2151.414(E) are present which would indicate that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent.  *In re B.K.*, 6th Dist. Lucas No. L-10-1053, 2010-Ohio-3329, ¶ 43.

{¶ 81} All of the court's findings under R.C. 2515.414 must be by clear and convincing evidence.  "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established.  *In re Tashayla S.*, 6th Dist. Lucas No. L-03-1253, 2004-Ohio-896, ¶ 14; *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.  Clear and convincing evidence is the highest level of evidentiary support necessary in a civil matter.  *In re Stacey S.*, 136 Ohio App.3d 503, 520, 737 N.E.2d 92 (6th Dist.1999).

28.

{¶ 82} We review a trial court's determination in a permanent custody case under a manifest-weight-of-the-evidence standard. *In re P.W.* 6th Dist. Lucas No. L-12-1060, 2012-Ohio-3556, ¶ 20. In doing so, we must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). While we review the evidence and consider witnesses' credibility, we must be mindful that the juvenile court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *In re P.W.* at ¶ 20. Its discretion in determining whether an order of permanent custody is in the best interest of a child "'should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" (Internal citations omitted.) *In re C.P.*, 10th Dist. Franklin No. 08AP-1128, 2009-Ohio-2760, ¶ 10.

**B. The Trial Court's Findings Under R.C. 2151.414(E)**

{¶ 83} The trial court found that under R.C. 2151.414(E)(1), notwithstanding reasonable case planning and diligent efforts by LCCS to assist A.M. to remedy the problems that initially caused W.E. to be placed outside the home, A.M. has failed to make significant progress in her case plan services. It also found that under R.C. 2151.414(E)(2), A.M. has chronic mental and emotional health concerns, she has failed to regularly engage in mental health services, and her mental health remains untreated.

29.

Accordingly, she is unable to provide an adequate home for W.E. at the present time and, as anticipated, within one year after the court holds the hearing.

{¶ 84} A.M. argues that her case plan services required her to get a mental health assessment, "presumably follow all recommendations," and utilize independent living services. She maintains that she completed independent living services and obtained and furnished an apartment using money she earned and saved in an independent living fund. Her utilities are on, her house is clean, and she participates in Bridges, which will help her maintain housing. She insists that she also participated in an assessment that produced no recommended services. She explains that her behavior has stabilized since leaving foster care, and LCCS's reasons why W.E. cannot be safely returned to her are based on speculative scenarios that *could* happen. A.M. emphasizes that LCCS expressed no concerns about her caregiving, she is employed, and her life is on track.

{¶ 85} The state acknowledges that A.M. participated in an assessment as it requested, but explains that through no fault of its own, the results of the assessment were never made available. A.M. refused its requests to participate in a second assessment. While it recognizes that A.M. submitted to an assessment as part of the delinquency case, it argues that because that assessment was not coordinated by LCCS, the agency was unable to provide input as to its concerns, and the assessment "was riddled with omissions and glaring inaccuracies"— most significantly, A.M.'s failure to inform the assessor that she has a child in the temporary custody of LCCS and her failure to disclose that she attempted suicide while detained. It insists that that assessment cannot,

30.

therefore, be relied upon. As for the progress that A.M. made in independent living services, LCCS contends that her completion of those services is "moot" because she failed to engage in and complete mental health services.

{¶ 86} It is evident here that A.M. has successfully completed independent living services. Regardless of the fact that she is living in a one-bedroom apartment, she has utilized the services that were made available to her—Independent Living and Bridges—and resides in a clean home with appropriate utilities. She has a steady job and, by this time, is presumably finished with school. There appears to be no concern with her parenting skills.

{¶ 87} What is problematic, however, is A.M.'s failure to undergo a second assessment through LCCS despite her documented mental health history. It is understandable that A.M. was reluctant to subject herself to a second assessment after Zepf failed to input the results of her first assessment. Unfortunately, it was crucial to her completion of case plan services. Had she been more candid during her August 2020 assessment—conducted as part of her delinquency case—and disclosed W.E.'s existence, LCCS's involvement, her suicide attempt, the nature of the criminal offense that necessitated the assessment, and the full extent of her juvenile record, perhaps LCCS may have deemed that assessment a suitable substitute to the one it requested. But absent this candor, it cannot be known what, if any, continued diagnoses were appropriate for A.M. and what, if any, services would have been recommended to treat those diagnoses. And, again, the completion of those services was necessary to regaining custody of W.E.

31.

{¶ 88} "A trial court's judgment will not be overturned as against the manifest weight of the evidence if the record contains competent credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements to terminate parental rights have been established." *In re J.H.*, 6th Dist. Lucas No. L-15-1230, 2016-Ohio-677, ¶ 29, citing *In re S.*, 102 Ohio App.3d 338, 344-345, 657 N.E.2d 307 (6th Dist.1995). Here, there exists in the record competent, credible evidence by which the court could have formed a firm belief that the essential statutory elements to terminate parental rights have been established. Accordingly, we must affirm the trial court judgment.

{¶ 89} We find A.M.'s single assignment of error not well-taken.

### III. Conclusion

{¶ 90} A.M. failed to complete case plan services when she refused to engage in a second mental health assessment after the results from the first assessment were effectively lost. While she participated in an assessment as part of a delinquency matter—not as part of the custody matter—she omitted important details and provided inaccurate information, thereby calling into question the assessor's conclusion that no mental health services were needed. Competent, credible evidence therefore exists in the record to support the trial court's conclusion that the essential statutory elements to terminate parental rights have been established.

32.

**{¶ 91}** We find A.M.'s assignment of error not well-taken. We affirm the October 21, 2020 judgment of the Lucas County Court of Common Pleas, Juvenile Division. A.M. is ordered to pay the costs of this appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

Thomas J. Osowik, J.

Christine E. Mayle, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.